IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO. 5:03CV47-V

| | |
|---|---|
| JOHN BOYLE & COMPANY, INC., ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM and ORDER |
| ) | |
| FRANK J. FASANO, ) | |
| Defendant. ) | |
| _____) | |

**THIS MATTER** is before the Court on Defendant's Motion For Summary Judgment, Memorandum Of Law & Exhibits In Support (Documents #34-37), Plaintiff's Memorandum Of Law & Exhibits In Opposition (Document #40), and Defendant's Reply (Document #41).

## I. Procedural History

On March 15, 2003, Plaintiff John Boyle & Company, Inc. ("Boyle") filed a lawsuit seeking declaratory judgment that a document purporting to establish an employee benefit plan for Defendant Frank J. Fasano ("Fasano") and John Boyle Bell, Jr. ("Bell") was null and void and seeking judgment against Fasano for breach of his fiduciary duties related to the alleged unauthorized transaction.[1]

On May 29, 2003, Defendant Fasano filed his Answer, Counterclaims, and Motion To Dismiss Plaintiff's Complaint pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(6). In his Answer, Fasano asserted that Plaintiff's claims were preempted by the Employee Retirement

---

[1] The document is dated September 9, 1998, and is referred to as the "September Agreement" or the "Agreement."

1

Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.*, and raised additional defenses of ratification, statute of limitations, estoppel, and laches. In addition, Fasano asserted counterclaims alleging that he is entitled to reinstatement of benefits under ERISA, 29 U.S.C. §1132(a)(1)(B), and monetary damages for Boyle's alleged breach of various oral and written contracts. Alternatively, Fasano sought compensation for the fair value of services allegedly provided to Boyle by Fasano from January 1, 2001 through April 14, 2003.

On June 16, 2003, Boyle filed its opposition to Defendant's Rule 12 motion and moved to amend its Complaint to include federal common law claims for unjust enrichment, rescission and restitution under ERISA, as well as state law claims for constructive fraud and unfair and deceptive trade practices.

On April 8, 2004, the Court issued a Memorandum and Order granting Plaintiff's Motion To Amend, with the exception of Boyle's unfair and deceptive trade practices claim pursuant to N.C. Gen. Stat. §75-1.1. (Document #22) In the same Order, Defendant's Motion To Dismiss was granted in part and denied in part. Id. The Court made the following findings of fact and conclusions of law, all of which are hereby incorporated by reference:

- The September Agreement is an employee benefit plan subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq*;
- Plaintiff's claims are not barred by the doctrine of "complete" preemption;
- Plaintiff does not have a statutory cause of action under ERISA because Plaintiff's claims do not fall within the scope of §502(a);
- Plaintiff's state law claims are preempted pursuant to "conflict"

- preemption;
- Plaintiff's breach of fiduciary duty claims are properly construed as federal common law claims under ERISA;
- Factual issues must be resolved before determining when Plaintiff's cause of action began to accrue under federal common law[2]; and
- The record does not contain adequate information to determine whether the alleged "conflict of interest" transaction claim is preempted under the doctrine of "ordinary" or "conflict" preemption.[3]

On September 27, 2004, Fasano filed an Amended Answer, Affirmative Defenses, and Counterclaims. (Document #30) Fasano asserted an additional counterclaim alleging breach of fiduciary duty by Boyle, and seeking monetary benefits under ERISA §502(a)(3), 29 U.S.C. §1132(a)(3). On October 12, 2004, Boyle denied the allegations set forth in Fasano's seventh counterclaim. (Document #31)

On April 29, 2005, Fasano moved for summary judgment. While the parties raise multiple issues, the critical legal issues are: 1) whether Boyle's state corporate law action alleging "conflict of interest" is preempted by ERISA; 2) whether Boyle's federal common law actions are barred by the statute of limitations; and 3) whether the September Agreement is enforceable by Fasano.

---

[2] Boyle contended that it was not aware of the alleged unauthorized activity by Fasano until April 14, 2003. The Court was unable to evaluate the reasonableness of Plaintiff's claim regarding lack of notice by reviewing only the pleadings.

[3] In its April 2004 Order, the Court also left open the related question of imposition of a constructive trust. Because constructive trust is a remedy rather than a separate cause of action or legal theory, the Court need not conduct a separate preemption analysis.

## II. Facts

Fasano began employment with John Boyle & Co., Inc., in 1969. (Fasano Aff., ¶1; Bell Aff., ¶3)  Fasano touts numerous professional contributions to the company during his thirty-two year tenure with Boyle.[4]  Fasano's various achievements included updating the accounting system, establishing an annual performance / salary review policy, improving Boyle's inventory valuation method, establishing an incentive plan for salesmen and management, securing health benefits with Blue Cross / Blue Shield, as well as overseeing the purchase of new assets, organization of a debt restructure, and each of the Company's physical moves. (Fasano Aff., ¶¶4, 5, 7-11, 14-20)  Fasano eventually became Boyle's Treasurer and Executive Vice President. (Fasano Aff., ¶15)

John Boyle Bell, Jr., is the majority shareholder and Chairman of the Board of Directors for Boyle. (Bell Aff., ¶2) Bell assumed control over Boyle upon his father's retirement. (Fasano Aff., ¶12)  Bell and Fasano worked relatively closely together from 1969 until Fasano's retirement in 2000.  (Bell Aff., ¶5; Fasano Aff., ¶ 23)  According to Fasano, the company was run like a partnership and he was essentially Bell's partner. (Def.'s Reply, at 7; Fasano Aff., ¶23)  Bell and Fasano were also friends. (Bell Aff., ¶¶5, 22)  Bell appointed Fasano trustee of his children's trust, which contained approximately 25% of Boyle's stock. (Bell Aff., ¶6; Fasano Aff., ¶25)  Fasano also managed or assisted Bell with other aspects of his personal finances. Id. (Fasano Dep., at 159; Bell Aff., ¶6)

---

[4] Boyle does not appear to disagree generally with Fasano's claim that he contributed significantly to the company during his employment but points out that Boyle's success is not solely attributable to Fasano. (Def.'s Exh. 11; Def.'s Reply, Attachments 3-1, 3-2; Bell Aff., ¶¶5-8)

4

With respect to financial decisions for Boyle, the respective roles of Bell and Fasano are portrayed differently by the parties. According to Fasano, "John Bell made all of the important financial decisions of the company." (Def.'s Mem. In Supp., at 12; Fasano Aff., ¶¶15, 21, 30, 32, 35-36) According to Boyle, "Fasano exercised total control over financial and other matters for the Company." (Pl.'s Mem. In Opp., at 3; Fasano Dep., at 24, 38; Bell Aff., ¶5) Bell claims that he "fully relied upon [Fasano] for financial recommendations" and "would sign financial documents only after Fasano's review and approval." (Bell Aff., ¶6)

After a period of time, Fasano was selected to serve on the Executive Committee with John B. Bell, Jr. (Fasano Aff., ¶6) According to Fasano, "[t]he Executive Committee made all compensation decisions and these decisions were kept confidential from the staff." (Id.) Minutes of the Executive Committee meetings were available only to the Board of Directors, comprised of Bell, Fasano, and Irving Schaffer (company accountant). (Id.; Exh. 1) Fasano further avers that "officers' salaries and benefits were not reviewed by the full Board of Directors and were not subject to approval of the share holders." (Id.) Fasano remained a member of the Executive Committee until October 2002. (Id.)

On or about September 9, 1998, during Fasano's employment with Boyle, a document was executed by Fasano and Bell. (Am. Compl., ¶7) The one-page, two-paragraph Agreement reads in part:

> "In recognition of the many years of dedicated service to the Company by Bell and Fasano, the Company agrees to pay Bell and Fasano an annual payment of $150,000.00 payable quarterly in advance each 1/1, 4/1, 7/1 and 10/1 ***in the event of termination of employment for any reason***, not limited to sickness, sale of the Company, merger, lay-off, retirement, etc. for life. In the event that their wives outlive them, then their wives would receive

5

>    fifty percent (50%) of $150,000.00 or $75,000.00, also payable quarterly in advance . . ."

(Pl.'s Exh. A; Def.'s Exh. 4) (*emphasis added*)  The September Agreement was adopted by Fasano and Bell, acting as the only members of Boyle's Board of Directors' Executive Committee.  (Id.)  Bell also signed the Agreement on behalf of Boyle as Chairman of the Board.[5]  (Id.)  At the time,  Fasano and Bell together had "voting control" over 98% of the company stock.  (Am. Compl., ¶11; Fasano Aff., ¶27)  The percentage of shares Fasano personally owned at that time is unclear.[6]  (Am. Compl., ¶11; Bell Aff., ¶16; Fasano Aff., Exh. 3)  It is undisputed that the September Agreement was never formally adopted by a majority of Boyle's disinterested directors or shareholders.  (Am. Compl., ¶¶13-15, 27; Bell Aff., ¶¶30-32)

The parties offer different explanations regarding the events that allegedly prompted the drafting of the September Agreement.  Bell contends that the *sole* purpose of the Agreement was to protect Fasano and Bell in the event of a takeover by a third-party.[7]  (Pl.'s Mem. In Opp., at 7-8; Bell Aff., ¶¶17, 21)  Fasano claims it was a contemporaneous news article published August 5, 1998, that *Bell* shared with Fasano and prompted *Bell's*

---

[5] Fasano alleges that Bell signed the Agreement a total of twelve times because his signature was required in two different capacities on the six copies executed.  (Fasano Aff., ¶28)

[6] According to Boyle's Amended Complaint, Fasano owned approximately 3.5% of the outstanding voting shares.  (Am. Compl., ¶11)  Fasano contends that he owned approximately 20%.  (Fasano Aff. / Exh. 3)

[7] According to Fasano, the only takeover negotiations Bell could be referring to, the potential L.G. Chemical purchase, ended almost two years prior to the execution of the Agreement.  Fasano produces a letter from a representative of L. G. Chemical dated August 16, 1996, indicating that L. G. Chemical's top management  "finally rejected the acquisition of the company."  (Def.'s Reply, Attach. 1)

insistence that Bell and Fasano benefit from a similar perk.[8] (Fasano Aff., ¶27 / Exh. 2)

Bell has since repudiated the September Agreement. (Am. Compl., ¶¶24, 25; Bell Aff., ¶¶17-20) Bell claims that before signing the Agreement, he specifically asked Fasano if language needed to be added to make it clear that such payments would be triggered only in the event Boyle was purchased. (Pl.'s Mem. In Opp., at 8; Bell Aff., ¶18) According to Bell, Fasano told Bell that Boyle's attorneys had reviewed and approved of the Agreement, and then advised Bell that the language was fine as is. (Bell Aff., ¶18) Bell states that he relied on Fasano's representation and would not have signed the Agreement had he known otherwise. (Bell Aff., ¶¶18, 20)

Fasano retired in December 2000. (Am. Compl., ¶16) Following his retirement, Fasano continued to be associated with Boyle as a member of its Board of Directors and through service on Boyle's Executive Committee. (Bell Aff., ¶ 10; Fasano Aff., ¶¶6, 32, 35-36 / Exh. 19) Bell asserts that Fasano's continued involvement was solely Fasano's idea. (Bell Aff., ¶15) Fasano suggests that Bell tried to persuade Fasano not to retire. (Fasano Aff., ¶31)

After his retirement, Fasano received quarterly payments under the terms of the September Agreement totaling approximately $337,500. (Am. Compl., ¶17) According to Boyle, Fasano failed to disclose the terms of the Agreement to Boyle's accountants and banks. (Am. Compl., ¶57) Although Fasano was considered the "principal contact" up until his retirement, Boyle's auditor / accountant, Barry Gershenoff, was unaware of the

---

[8] Contrast Fasano's version with Bell's. Bell claims that *Fasano* brought the article in and suggested a similar agreement. (Bell Aff., ¶17)

7

Agreement until November 2003. (Pl.'s Mem. In Opp., at 11;Gershenoff Dep., at 15.) Boyle alleges that Fasano manipulated personnel in order to obtain payment under the Agreement and directed that his payments under the Agreement be masked as "consulting fees." (Williams Aff., ¶5)

Boyle claims Bell had no knowledge that Fasano was receiving payments under the Agreement prior to early 2003. (Pl.'s Mem. In Opp., at 11; Bell Aff., ¶21; Fasano Aff. / Exh. 19) Paul Stelzner apparently mentioned the September Agreement to Bell but never seriously questioned it for fear of losing his job. (Stelzner Aff., ¶10(a)). Bell admits in his affidavit, "I have a vague recollection of Paul Stelzner coming into my office in December 2000 and saying something about retirement payments being made to Fasano. I do know that no one told me in December 2000, 2001 or 2002 that payments were going to be made or were being made to Fasano under the terms of that September Agreement." (Bell Aff., ¶26) Jeffrey Brown, Controller (and then Vice President of Finance), and Jon Williams, another Boyle employee, also conceded that Fasano informed them about the Agreement and post-retirement payments prior to Fasano's retirement in 2000. (Brown Aff., ¶15; Williams Aff., ¶5) Boyle paid Fasano through April 14, 2003. (Fasano Aff. / Exh. 6)

In August 2002, Boyle notified Fasano that the lease on his company car and the payment of insurance premiums would cease. (Bell Aff., ¶22; Def.'s Countercl., Facts ¶¶6,7 and Second Countercl., ¶¶1-5) According to Bell and others at Boyle, Fasano's continued involvement in Boyle's daily operations had become problematic in that Fasano undermined the authority of current employees. (Bell Aff., ¶¶13-15; Stelzner Aff., ¶¶12-16;

8

Brown Aff., ¶¶12-14) Paul Steltzer implies that the cancellation of certain benefits was an attempt to discourage Fasano from maintaining such an active post-retirement role. (Stelzner Aff., ¶16)

In 2003, Board of Directors member, Walter Robb, requested additional information from Jeff Brown, Vice President of Finance, regarding Boyle's expenses designated as "professional and consulting fees." (Brown Aff., ¶¶17, 18) According to Brown, Fasano directed Brown to forward the information directly to Fasano who would then explain the figures to Robb. (Brown Aff., ¶19)

On March 28, 2003, Bell requested by letter a meeting with Fasano to discuss the payments Fasano was drawing from Boyle. (Fasano Aff. / Exh. 19) The letter informed Fasano that Bell had instructed finance to cease payments immediately. (Id.)

On April 14, 2003, Fasano met with Bell and Boyle's counsel. (Am. Compl., ¶27) According to Bell, Fasano admitted during the meeting that the Agreement was never approved by the Board of Directors. (Id.) Boyle sought repayment of the $337,500 but Fasano refused to repay the money. (Am. Compl., ¶¶26, 29) By letter, also dated April 14, 2003, Boyle, through Bell, advised Fasano that he was being removed from the Board of Directors and would no longer hold any office for Boyle. (Am. Compl., ¶25)

### III. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c);

Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. Celotex Corp., 477 U.S., at 325.

### IV. Analysis

**A. Plaintiff's State Law "Conflict Of Interest" Claim Pursuant To N.C. Gen. Stat. §55-8-31 & Delaware Statute Is Not Preempted** [9]

In its April 8, 2004 Memorandum and Order, the Court deferred ruling on whether Plaintiff's declaratory judgment action based upon state corporate law prohibiting "conflict of interest" transactions was preempted.[10] (M & O, at 11-13.) The Court found that Plaintiff's claims attacking the legality of the agreement on this theory were of a "preliminary" nature and did not appear to defeat ERISA's goals. (M & O, at 11-12.) The Court also distinguished this claim from those dealing strictly with *administration* of the September Agreement. (M & O, at 12.)

For purposes of determining whether Boyle's declaratory judgment action is subject to the doctrine of "conflict" preemption, the Court considers "whether the conduct complained of in the plaintiff's complaint [was] conduct undertaken by [defendant] in the

---

[9] The Delaware and North Carolina corporations statutes are essentially identical and both have been held to apply to closely-held corporations. (Pl.'s Mem. In Opp., at 16-17 n. 6)(*citations omitted*).

[10] 29 U.S.C. §1144(a).

10

performance of its plan administration fiduciary duties for an ERISA plan." Darcangelo v. Verizon Commc'n Inc., 292 F.3d 181, 189 (4th Cir.2002).

Defendant's motion asks the Court to evaluate whether the transaction is fair to the corporation such that Bell and Fasano were not required to obtain approval from the disinterested directors or shareholders. N.C. Gen. Stat. §55-8-31(3).[11] After reviewing the additional evidence presented, the Court concurs with its initial impression that Plaintiff's state statutory claim is sufficiently distinct from the ERISA claims.[12] Given that Boyle's allegations in this regard precede the establishment of the Agreement, and do not interfere with ERISA's aims, preemption is not required. Smith v. Cohen Benefit Group, Inc., 851 F. Supp. 210, 213 (M.D.N.C. 1993) (*citing* Perkins v. Time Ins. Co., 898 F.2d 470, 473 (5th Cir.1990)("A state law claim . . . which does not affect the relations among the principal ERISA entities (the employer, the plan fiduciaries, the plan, and the beneficiaries) as such is not preempted by ERISA) and Stanton v. Gulf Oil Corp., 792 F.2d 432, 434-435 (4th Cir.1986)(no status or duties until plan in effect)); Perry v. P*I*E* Nationwide, Inc., 872 F.2d 157, 160-62 (6th Cir.1989)(no preemption where alleged fraud

---

[11] Under North Carolina law, a transaction with a corporation in which a director of the corporation has a direct or indirect interest is not voidable by the corporation if:
    (1) the material facts of the transaction are disclosed to and approved by a majority of the disinterested directors;
    (2) the material facts of the transaction are disclosed to and approved by the disinterested shareholders; or
    (3) the transaction was fair to the corporation.

N.C. Gen. Stat. §55-8-31.

[12] The claims overlap to a certain degree but are not inconsistent in any way. A careful reading of Boyle's Amended Complaint reveals that Boyle's federal common law claims alleging unjust enrichment, and seeking rescission and restitution, mirror Boyle's declaratory judgment action based upon state corporations law.

occurred prior to the time plaintiff entered the plan and Congress had not provided a remedy for the wrong asserted).

### B. Genuine Issues Of Material Fact Preclude Summary Judgment On Boyle's "Conflict Of Interest" Transaction / N.C. Gen. Stat. §55-8-31

Boyle contends that the September Agreement was not intended to be a retirement plan for Fasano or Bell because Boyle already had a defined benefit and retirement plan in place that was created by Fasano. (Bell Aff., ¶19) Boyle refers to Fasano's idea to draft the September Agreement as "unprecedented."[13] (Fasano Aff. / Exh. 19) Boyle asserts that the Agreement is unfair to Boyle because it "substantially reduces the fair market value of Boyle," diminishes the value of the shareholders' equity, and benefits Fasano to the detriment of the company and its shareholders. (Am. Compl., ¶¶12-21)

Fasano contends that the September Agreement and the manner in which it was created and adopted was completely consistent with company policy and precedent. As an example of Boyle's practice with respect to compensation decisions, Fasano states that a "top hat" plan[14] - a deferred compensation annuity that cost Boyle $230,000.00 for the benefit of both Fasano and Bell - was purchased in 1993 at the direction of Bell without approval of the full Board of Directors or the shareholders. (Fasano Aff., ¶21; Def.'s Reply Attach. 4 / 3-22-93 Executive Committee Minutes; Fasano Dep., at 120.) In addition, Fasano claims that he and Bell "received many perks, including expensive cars and big

---

[13] Apparently, even John B. Bell, Sr., the company's founder, only received a ten-year retirement benefit package upon his retirement. (Fasano Aff., ¶12; Bell Aff., ¶19)

[14] A "top-hat" plan is defined by ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees . . . " 29 U.S.C. §1051(2).

12

bonuses" - none of which were "approved by formal action of the Board of Directors nor the disinterested Shareholders." (Fasano Aff., ¶23)

Given the parties' contrary evidence, the parol evidence rule is implicated. Generally, the parol evidence rule "precludes the introduction of prior and contemporaneous statements between the parties to alter or contradict the terms of a written agreement." Yarn Indus., Inc. v. Krupp Int'l, Inc., 736 F.2d 125, 129 (4th Cir. 1984). However, parol evidence is admissible to establish allegations of fraud, mistake, or other equitable relief. Id.; Holt v. Quaker State Oil Refining Co., 67 F.2d 170, 171 (4th Cir.1933)(parol evidence rule does not apply where the issue is whether the contract was procured by fraud).

In this context, the parole evidence rule does not preclude the Court from considering extrinsic evidence relevant to Boyle's claim regarding the validity of the Agreement. The Third Circuit Court of Appeals explained:

> While the parole evidence rule generally prohibits the admission of evidence that contradicts the terms of an integrated, unambiguous writing, the "rule does not apply to evidence introduced to show that a contract was void or voidable." Coleman v. Holecek, 542 F.2d 532, 535 (10th Cir. 1976). Therefore, "events antecedent to the making of a contract which negate mutuality of assent, such as duress or fraud, ***or demonstrate a condition to be fulfilled before the obligations of the contract are to vest***, may also be the subject of parole evidence. 4 Walter H.E. Jaeger, *Williston on Contracts*, §631, at 950 (3d ed. 1961).

Connors v. Fawn Mining Corp., 30 F.3d 483, 493-94 (3rd Cir. 1994)(*emphasis added*). The North Carolina rule comports with the view of the Third Circuit. The North Carolina Supreme Court recently explained, "Where a contract [] is induced by misrepresentations, the fraud and the contract are "distinct and separable – that is, the representations are

usually not regarded as merged in the contract." " Godfrey v. Res-Care, Inc., 165 N.C. App. 68, 78, 598 S.E.2d 396 (2004) (*quoting* 23 Am. Jur., Fraud and Deceit, §23, p. 775-76.) (parole evidence admissible to prove that a written contract was procured by fraud since allegations of fraud challenge the validity of the contract itself as opposed to the accuracy of the terms) (*quoting* Fox v. Southern Appliances, 264 N.C. 267, 270, 141 S.E.2d 522 (1965)). Because the parole evidence rule does not render Plaintiff's extrinsic evidence inadmissible for purposes of this claim only, genuine issues of material fact exist precluding summary judgment.

### D. Plaintiff's Federal Common Law Claims For Breach Of Fiduciary Duty, Unjust Enrichment, Rescission, Restitution, and Constructive Fraud Are Not Barred By The Statute Of Limitations

The viability of the Plaintiff's federal common law claims depend upon accrual of the statute of limitations. Because ERISA does not expressly identify a limitation within which a federal common law claim may be brought, the most analogous state law limitations period applies. (M & O, at 15; Dameron v. Sinai Hosp. Of Baltimore, Inc., 815 F.2d 975, 981 (4th Cir.1987). While state law provides the governing limitations period, federal law determines when a federal cause of action accrues. (M & O, at 15; 4 Employ. Coordinator, ¶B-29, 230 (2004). Under federal common law, a cause of action accrues when the plaintiff knows or has reason to know that he or she has been injured. Id. (*citing* Bennett v. Federated Mutual Ins. Co., (8th Cir.1998)). Thus, the Court considers when Boyle should have *reasonably* known of its injury.

14

Fasano contends first that Boyle was aware of the Agreement upon its inception. (Fasano Aff., ¶27) According to Fasano, Boyle's federal common law claims are barred by a three-year statute of limitations period - under both N. C. Gen. Stat. §§1-52(1) and (9).[15] Under Fasano's calculation of the limitations period, however, commencement of the statute was triggered by execution of the Agreement. (Def.'s Mem. In Supp., at 9 - 13.) Fasano did not retire and begin receiving payments until more than two years later. Boyle was not injured until Fasano began receiving payments under the Agreement.

As for the timing of Boyle's knowledge, Fasano avers that the payments he received had to be approved by Bell personally. (Fasano Aff., ¶30) Fasano further alleges Bell acknowledged the retirement payments many times orally. (Fasano Aff., ¶¶31-33) Fasano also provides a copy of a letter from Bell dated August 27, 2002, which refers to Fasano's "unique and generous compensation arrangement." (Def.'s Exh. 9) According to Fasano, Bell's reference to the "unique and generous compensation arrangement" supports his claim that Bell was fully aware of the fact that Fasano was being compensated pursuant to the September Agreement. (Def.'s Reply, at 6; Fasano Aff., ¶32) Again, Bell denies any knowledge that Fasano was receiving payments based upon the September Agreement (as opposed to receiving monies pursuant to the company's thrift and pension

---

[15] Notwithstanding Boyle's incorporation in Delaware, the Court looks to North Carolina law as suggested by the parties. (Pl.'s Mem. In Opp., at 33, n.10; Def.'s Mem. In Supp., at 9-10.) Subsection (1) of 1-52 is the limitations period for breach of contract. Subsection (9) is the limitations period for fraud. Fasano argues that Boyle's breach of fiduciary duty claim falls within the fraud limitations period since North Carolina courts construe breach of fiduciary claims as fraud. See Fulton v. Talbert, 255 N.C. 183, 170 S.E.2d 410 (1961). Boyle contends that certain types of breach of fiduciary duty claims fall under a ten-year statute of limitations period. N. C. Gen. Stat. 1-56; Speck v. North Carolina Dairy Foundation, Inc., 64 N.C. App. 419, 426-29, 307 S.E.2d 785 (1983), *rev'd on other grounds*, 311 N.C. 679, 319 S.E.2d 139 (1984). The Court need not reach this issue.

plan or annuity). (Bell Aff., ¶¶21-23)

Aside from any alleged express or implied approval by Bell, of the nine checks, four were authorized by Paul Stelzner. (Fasano Aff. / Exh. 6) At the time, Stelzner carried the title of "President" or Chief Executive Officer and was a member of Boyle's Board of Directors. (Stelzner Aff., ¶6) The first check was in the amount of $37,500.00, dated January 5, 2001, and signed by Stelzner. (Def.'s Exh. 6) Given Stelzner's status as an officer and director with Boyle, Stelzner's knowledge is properly imputed to Boyle.[16]

Viewing the evidence in the light most favorable to Plaintiff, Boyle cannot reasonably claim lack of notice beyond issuance of the first quarterly payment, or January 5, 2001.[17] (*See also* Def's Exhs. 15-17) This action was commenced on April 15, 2003. Therefore, even under a 3-year limitations period, Boyle's action is timely filed. Defendant's motion for summary judgment based upon statute of limitations must be denied.

---

[16] Boyle contends that Fasano must demonstrate *Bell 's* knowledge of the alleged breach of fiduciary duty because "Bell was the only officer, director and shareholder of Boyle (other than Fasano) who understood the true nature of the September Agreement." (Pl.'s Mem. In Opp., at 35.) What Bell actually knew and when is a factual question that cannot be decided by this Court at summary judgment. The exact timing of Bell's knowledge is not material given the Court's analysis.

[17] The Court's ruling is consistent with Fasano's contention that Boyle's knowledge of the facts and circumstances giving rise to the alleged injury (as opposed to their legal significance) triggers the statute of limitations. Miller v. Pacific Shore, 92 Fed. Appx. 933, 935 (4th Cir.2004).

**E. Genuine Issues Of Material Fact Exist Precluding Summary Judgment On Plaintiff's Claims & Defendant's Affirmative Defenses / Counterclaims**

The affirmative defenses and counterclaims asserted by Fasano also give rise to jury questions. As for ratification, according to Boyle, the post-retirement payments made to Fasano between 2001 and 2003 do not constitute a ratification of the Agreement because Boyle did not have knowledge of all the material facts and circumstances relative to the payments.[18] In addition to the questions of fact already identified by the Court, factual issues exist regarding the disclosure and effect of documentary evidence produced by Fasano, particularly internal company documents describing payments made to Fasano related to his "retirement agreement."[19] (Def.'s Exhs. 11, 16)

Likewise, Fasano's counterclaims cannot be determined as a matter of law at this stage of the litigation. Fasano's ERISA counterclaims regarding reinstatement of benefits and alleged breach of fiduciary duty depend necessarily on the same evidence as Boyle's causes of action. For these reasons, Defendant's motion is properly denied.

**F. If The September Agreement Is Found To Be Valid And Enforceable, It Must Be Enforced As Written As The Agreement Is Unambiguous**

Notwithstanding the Court's ruling that parol evidence is admissible for purposes

---

[18] Boyle relies upon a similar argument in its response to the remaining equitable defenses asserted by Fasano.

[19] For instance, there is a dispute with respect to disclosure of a document prepared in advance of a Board of Directors' meeting on 23, 2001. (Williams Aff., ¶7-9; Brown Aff., ¶10; Fasano Aff. / Exh. 16) The document, entitled "Extraordinary Expenses Fiscal Year 2001," includes reference to "Frank Fasano Retirement Agreement" and corresponding payment of $150,000. (Williams Aff., ¶8 / Exh. A; Brown Aff., ¶10; Fasano Aff. / Exh. 16) Fasano points to the internal document as evidence of Boyle's knowledge. According to Williams, Fasano became angry and did not allow the document to be distributed along with the other financial information provided to the Board. (Williams Aff., ¶9; Brown Aff., ¶10)

of Boyle's statutory action to void the Agreement pursuant to state corporations law, parol evidence is not admissible for the purpose of altering the plain language of the Agreement.[20]

The award of benefits "under any ERISA plan is governed in the first instance by the language of the plan itself." Blackshear v. Cuddy Farms, Inc., 1996 U.S. Dist. LEXIS 17895 (E.D.N.C. 1996)(*quoting* Hickey v. Digital Equip., 43 F.3d 941, 947 (4th Cir.1995)). "While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." Id. (*quoting* Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 56 (4th Cir.1992)). "Unless there exists an ambiguity, the construction and effect of the terms in the [] [a]greement is a question of law." Id.; Denzler v. Questech, Inc., 80 F.3d 97 (4th Cir.1996). If there is no ambiguity, "extrinsic evidence may not be used to alter the written terms of the plan."" Id. (*internal citation omitted*); Denzler, 80 F.3d, at **14 (no extrinsic evidence considered where ERISA document is unambiguous).

The only trigger for benefits under the September Agreement is the "termination of employment." (Pl.'s Exh. A; Def.'s Exh. 4) Despite Boyle's argument that the *true* intent of the parties is not evident from the Agreement and is as Bell describes, the Court finds the Agreement unambiguous as a matter of law. Indeed, the Agreement, which was signed by Bell - Chairman of the Board and majority shareholder - as many as twelve

---

[20] To the extent Boyle's federal common law claims under ERISA challenge the validity (versus the meaning and effect) of the Agreement, parol evidence is also admissible for that purpose.

times, expressly states that termination of employment means "termination of employment for any reason" and includes termination "not limited to sale of the Company, merger, . . . etc." (Pl.'s Exh. A; Def.'s Exh. 4) Therefore, the Agreement must be enforced, if at all, as it is written.

**IT IS, THEREFORE, ORDERED THAT:**

1) Defendant's Motion For Summary Judgment is hereby **GRANTED in part** and **DENIED in part** consistent with the terms of this Memorandum and Order;

2) Plaintiff's "conflict of interest" claim pursuant to N.C. Gen. Stat. § 55-8-31, constructive fraud action, and federal common law actions pursuant to ERISA may proceed to trial;

3) Defendant's Counterclaims may proceed to trial;

4) All factual findings will be determined by the jury;

5) Based upon the factual findings, the Court will resolve any remaining questions of law; and

6) The scheduling of the trial of this matter shall be discussed at Calendar Call, March 6, 2006, at 10:00 AM, Statesville Division.

Signed: March 3, 2006

Richard L. Voorhees
Chief United States District Judge